UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC P., <br> Plaintiff, <br> v. <br> DIRECTORS GUILD OF AMERICA, et al., <br> Defendants. | Case No. 19-cv-00361-WHO <br><br> **ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Before me are the parties' cross-motions for summary judgment regarding the denial of plaintiff Eric P.'s claim for medical treatment under the Employee Retirement Income Security Act of 1974 ("ERISA") by defendants Directors Guild of America, Directors Guild of America-Producer Health Plan, and Blue Cross of California (the "Plan"). Eric argues that the Plan abused its discretion in denying his claim for benefits on behalf of his daughter. I am sympathetic to his decision to have his daughter treated in what he thought was the most effective way, and if my review was de novo and not abuse of discretion, I might well have concluded that the Plan should have made a different decision. However, his legal arguments rely largely upon an interpretation of the facts that is not supported by the record. He has failed to identify any procedural violations in the Plan's handling of his claim that would affect the standard of review for abuse of discretion. I find that the Plan did not abuse its discretion in its denial of his claims; it was reasonable to conclude that treatment less intensive than residential treatment was appropriate and medically necessary given Eric's daughter's prior eight-week stay in a residential treatment facility. Accordingly, I GRANT the Plan's motion for summary judgment and DENY Eric's motion for summary judgment.

# BACKGROUND

## I. RP'S MEDICAL HISTORY

This case involves Eric's medical claim for treatment of his minor and dependent daughter, RP. RP has suffered from several mental health conditions since she was a young child, including mood disorder, bipolar disorder, attention deficit hyperactivity disorder, generalized anxiety disorder, oppositional defiant disorder, and depression. PLAN000135, 140, 320. In 2015, RP was also diagnosed with type 1 diabetes. *Id.* at 140. After this diagnosis, RP regularly failed to comply with her diabetes treatment, which included insulin injections, as a result of one or more of her mental health conditions and a phobia of needles. *Id.* at 124.

In September 2016, RP's parents took her to UCLA's inpatient hospital psychiatric unit due to complications resulting from poor diabetes management, after which she was moved to a partial hospitalization program. *Id.* She was hospitalized again in December 2016 after she ran away from home. *Id.* Later, RP was treated at UCLA's hospital day program and its intensive outpatient treatment program for almost three months. *Id.* at 281. During this time, RP's doctors, including Susan Schmidt-Lackner and Robert Scholz, recommended a long-term residential treatment setting and a "higher level of care" than outpatient treatment. *Id.* at 124, 281. RP's doctors noted that an immediate concern facing RP was her inability to care for her diabetes. *Id.* at 124, 281. Although RP's mental condition was concerning for a variety of reasons, she did not appear to have any problems with respect to self-harm and her greatest risk was that of life-threatening diabetes complications. *Id.* At least one severe complication resulting from improperly treated diabetes is diabetic ketoacidosis. She was not admitted for ketoacidosis, although in September 2016 she had very elevated levels of Hemoglobin A1C. *Id.* at 134. After her first inpatient stay, she had a brief period of compliance with her diabetes management. *Id.*

RP was treated at ViewPoint Center, a residential treatment facility, between January 10, 2017 and March 6, 2017.[1] *Id.* at 130. At this time, nurse Jennifer Young, therapist Britten Lamb,

---

[1] The parties do not dispute the dates of the stay, which is reflected in the record. Although some sources state that this was a six-week period, RP's dates of admission and discharge reflect that her stay was eight weeks.

and neuropsychologist Jordan Rigby treated RP. *Id.* at 132. All of them recommended that RP continue in a residential treatment program and could not recommend that RP return home due to her level of distress with her family and inability to manage her diabetes. *Id.* at 140, 157, 182-85. In addition, Dr. Rigby noted that although RP's diabetic management was perhaps the most important issue, RP needed substantial psychiatric and behavioral treatment. *Id.* at 182. Young noted that RP "is managing her diabetes, but aside from this, cognitive rigidity is clearly interfering with reasonable judgment." *Id.* at 140.

Immediately after her discharge from ViewPoint, RP was admitted to Uinta Academy, a licensed residential treatment center in Utah. *Id.* at 127, 2609. Her reasons for admission included "unspecified mood disorder, poor management of her type I diabetes, lack of compliance with her medications including blood sugar testing, problems with motivation, oppositional behavior, executive function, basic cleanliness and mood lability, sleep dysfunction, poor cognition and problem solving, severe anxiety, low frustration tolerance, poor self-esteem/poor sense of self, and an inability to take personal responsibility and accountability." *Id.* at 2609.

On July 19, 2017, RP's endocrinologist of two years, Dr. Aliana Vidmar, wrote a letter discussing RP's inability to manage her diabetes. *Id.* at 283. Dr. Vidmar stated that while treating RP she "strongly recommended . . . that she be enrolled in a residential treatment environment to address all of the above behaviors at that time which were negatively affecting her diabetes control and placing her in danger of serious medical complications." *Id.* Dr. Vidmar noted that reports demonstrated that RP "thrived" in this setting. *Id.*

Also on July 19, Dr. Randi Klein, a therapist that Eric and his wife retained in January 2017, wrote a letter regarding RP's treatment. *Id.* at 278. After consulting RP's academic and psychological records, Dr. Klein recommended that "further immediate treatment in a residential treatment program would be in [RP's] overall best health interest and safety." *Id.* He also stated that "the family had exhausted all local and outpatient programs to date." *Id.* He recommended that ViewPoint was an appropriate treatment setting, and "[a]fter View Point Center I recommended Uinta Academy [to] be a place that can treat [RP] and the family and meet their needs." *Id.*

3

On March 13, 2018, Dr. Schmidt-Lackner wrote a letter referring to her prior treatment of RP and noting that RP "is at extremely high risk." *Id.* at 124. She recommended continued residential treatment. *Id.* On March 19, 2018, Dr. Bret Marshall and Dr. Melissa Adamson from Uinta wrote a letter describing RP's progress at Uinta and stated that "without continued therapeutic support [RP] will lose the progress she has made and will not be able to reach her full potential. *Id.* at 127-29. In addition, "[w]hile [RP] has made some clinical progress since admission, she continues to need a highly structured and clinically intensive environment" and she "has not yet demonstrated the ability to safely and effectively manage her diabetic care." *Id.* at 127-28. They recommended that RP continue treatment at Uinta. *Id.*

RP was discharged from Uinta on July 16, 2018. *Id.* at 2551.

## II. ERIC'S CLAIMS TO THE PLAN

According to the Plan,
> A treatment, service or supply is Medically Necessary when it is:
> - Consistent with generally accepted medical practice within the medical community for the diagnosis or direct care of symptoms, sickness or injury of the patient, or for routine screening examination under wellness benefits, where and at the time the treatment, service or supply is rendered (the determination of "generally accepted medical practice" is the prerogative of the Health Plan through consultation with appropriate authoritative medical, surgical, or dental practitioners);
> - Ordered by the attending licensed physician (or, in the case of dental services, ordered by the dentist), and not solely for the convenience of the participant, his or her physician, Hospital or other health care provider;
> - Consistent with professionally recognized standards of care in the medical community with respect to quality, frequency and duration; and
> - The most appropriate and cost-efficient treatment, service or supply that can be safely provided, at the most cost-efficient and medically appropriate site and level of service.

PLAN002807-08. The parties do not dispute that the Plan authorized RP's stay at ViewPoint as medically necessary. *Id.* at 394.

Anthem Blue Cross ("Anthem") serves as the Plan's claims administrator that makes initial claim determinations for certain services, including residential treatment. *Id.* at 2777, 2780. Anthem's internal guidelines consider treatment to be medically necessary when a "Member's clinical condition is of such severity that daily member medical evaluation by a physician or other

4

provider with prescriptive authority is indicated," and one of the following:

    A.    Imminent suicidal risk or danger to others – immediate danger to self and/or others is apparent or behavior indicating a plan that would result in risk to self or others, such that the degree of intent, method, and immediacy of the plan requires a restrictive inpatient setting with psychiatric medical management and nursing interventions on a 24-hour basis; or

    B.    Presence of acute psychotic symptoms – severe clinical manifestations, symptoms or complications that creates immediate risk to self or others due to impairment in judgment which preclude diagnostic assessment and appropriate treatment in a less intensive treatment setting and requires 24-hour nursing/medical assessment, intervention and/or monitoring; or

    C.    Grave disability – acute impairment exists, as evidenced by severe and rapid decrease in level of functioning in several areas of life (work, family, activities of daily living [ADL's], interpersonal), to the degree that the member is unable to care for him or herself, and therefore is an imminent danger to self or others which precludes diagnostic assessment and appropriate treatment in a less intensive treatment setting and requires 24-hour nursing/medical assessment, intervention and/or monitoring; or

    D.    Self-injury or uncontrolled risk taking behaviors or uncontrollable destructive behavior creating immediate risk to self or others which requires medical intervention and containment in a 24-hour a day acute setting.

Dkt. No. 52-9 at 2-3.

On October 3, 2017, Anthem received a claim for authorization related to RP's residential care at Uinta. Dkt. No. 52-9 at 240. Anthem denied this claim "because the service does not meet the criteria for 'medically necessary' under your description of benefits." PLAN000018. It noted that Dr. Amy Dewar, who is Board Certified in Child and Adolescent Psychiatry by the American Board of Psychiatry and Neurology, had reviewed the claim. PLAN000019; Dkt. No. 53-12. According to Dr. Dewar, the claim failed because "[t]he plan clinical criteria considers short-term residential treatment medically necessary for those who meet all the following: 1) their behaviors have worsened and risk serious harm to themselves or others; 2) the behaviors or actions cannot be managed outside of a 24 hour structured setting; 3) their living situation keeps them from getting needed treatment; and 4) [i]mprovement can be expected from a short-term residential stay." PLAN000019. The denial further states that "[i]n making medical necessity determinations that are consistent with our contract language and currently accepted standards of care, Medical Reviewers follow established criteria and guidelines when available and applicable to the member's situation, including the health plans['] Medical Policies, Clinical Guidelines and/or

other available information such as peer reviewed or evidence based literature." *Id.* It further states that Anthem will provide the applicable criteria used in this case free of charge upon request. *Id.*

Eric appealed Anthem's initial decision on January 23, 2018. Dkt. No. 52-9 at 261. Dr. Charlissa Allen, who is also Board Certified in Psychiatry and Neurology, upheld the prior decision after "review[ing] all the information that was given to us before with the first request for coverage." PLAN000023-24; Dkt. No. 53-13. The decision stated:

> Your doctor wanted you to stay longer in residential treatment center care beginning March 6, 2017. You were getting this because you had been at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason. After the treatment you had, you were no longer at risk for serious harm that needed 24 hour care. You could have been treated with outpatient services. We based this decision on this health plan guideline (Psychiatric Disorder Treatment - Residential Treatment Center (RTC) (CG-BEH-03))

PLAN000023-24. The letter provided information about where to find the applicable medical policies and clinical guidelines. *Id.*

On February 6, 2018, Eric filed an appeal to the Plan, stating that to date he had not received any denials in writing but understood from a phone call that his claim had been denied. *Id.* at 99. The Plan referred the appeal to Medical Review Institute of America, LLC ("MRI"). *Id.* at 101. Dr. Monika Roots, certified in General Psychiatry and Child and Adolescent Psychiatry, found that treatment at Uinta was not medically necessary under either the Anthem guidelines or the Plan, and that "[t]he most cost effective and efficient modality for the treatment of the patient's diagnosis would be weekly outpatient individual and psychiatric medication management." PLAN000101-05; Dkt. No. 53-8. She found that the Plan definition was not satisfied because "[t]he submitted documentation has no specific clinical [documents] regarding risk behaviors with frequency, severity and duration, as well as previous treatment trials." PLAN000102. In addition, Anthem's clinical guidelines were not met because "[t]here is no indication of risk behaviors, suicidal ideation, homicidal ideation, psychotic symptoms, aggression, self injurious behaviors, or comorbid concerns that required around the clock care." *Id.*

Eric again appealed on March 22, 2018 and provided documentation that he understood had not been sent to Anthem and offered additional documentation if needed. *Id.* at 113. The appeal quoted and provided the earlier letters from RP's treatment providers. *Id.* at 114-18. MRI again reviewed the appeal, this time by Dr. Paul Hartman, who is Board Certified in Child and Adolescent Psychiatry. PLAN000352-56; Dkt. 53-9. Dr. Hartman noted that he called and left several voice messages with Dr. Schmidt-Lackner and Dr. Marshall. PLAN000352. He concluded that RP's treatment at Uinta was not medically necessary under the Plan definition because:

> The patient is not suicidal or homicidal. The patient is not self-harming or physically aggressive. The patient is capable of providing for basic self-care needs. The patient is psychotic and highly anxious, with impaired judgment, but refusing psychotropic medications. However, medications can be ordered to be given to the patient against her will (such as by injectable antipsychotic medications) by parents or by a court order, and in the absence of this, significant improvement is unlikely to take place. By 03/06/17, the patient had already reached the maximum benefit from treatment at the previous residential program that she attended from 01/10/17 through 03/06/17. Treatment refusal by the patient in the absence of documented efforts to enforce medication compliance is not a rationale for continuation of residential treatment in a different residential facility. As a result, the patient's ongoing mental health needs can be managed in a less restrictive setting, such as an intensive outpatient program (IOP).

*Id.* at 353-54. He further found that treatment was not warranted under the Anthem guidelines because they "require the patient to have symptomatic deterioration with self injurious or risk taking behavior that cannot be managed outside of a 24 hour facility, which was not met . . ." *Id.* at 354. Dr. Hartman concluded that "[i]ntensive outpatient program (IOP) level of care is the most cost effective and efficient modality for the treatment of the patient's diagnosis." *Id.* On April 30, 2018, Dr. Hartman conducted another review and affirmed his conclusion with respect to the Plan's definition of medically necessary. *Id.* at 370-74.

On April 9, 2018, the Plan notified Eric of MRI's findings. *Id.* at 357. It stated that RP's treatment at Uinta was "not medically necessary in accordance with the plan definition of medically necessary and Anthem's medical policy and clinical guidelines." *Id.* The letter described the Anthem guidelines and quoted the Plan's definition of medically necessary. *Id.* at 358-59. Eric appealed to the Benefits Committee, and on April 19, 2019, the Plan informed Eric

that the appeal would be heard on June 5, 2018. *Id.* at 369.

On May 23, 2018, Eric's attorneys contacted the Plan and notified it of their representation of Eric. *Id.* at 376. They requested that the appeal be rescheduled while they further investigated the claim and stated that they would provide any further information. *Id.* On August 20, 2018, Eric's counsel requested certain information from the Plan, *id.* at 386, and the Plan provided some of this information. *Id.* at 389. As to other information, the Plan stated that it did not maintain the requested information or that it was confidential. *Id.* at 389-92.

Eric's attorneys sent a detailed letter to the Plan on October 1, 2018, explaining why they disagreed with the claim denial and attaching a 2246-page disc of records. *Id.* at 393-400. MRI conducted another review of Eric's claim on October 18, 2018. *Id.* at 2647-51. Dr. William Holmes, an MRI doctor who is Board Certified in General Psychiatry and Adolescent Psychiatry, concluded that the treatment was not medically necessary under the Plan "primarily due to a lack of evidence of symptom severity at the time of admission that would support the need for ongoing residential treatment." PLAN002649; Dkt. No. 53-10. He noted that "the patient had just been treated in a separate residential setting for 6 weeks for the same concerns leading to this admission. At the time of discharge from the previous setting and admission to the current setting, there is a lack of evidence that the patient required treatment involving monitoring, observation, and treatment in a 24 hour a day setting." PLAN002649. Further,

> The patient had chronic problems with mood lability, explosive outbursts, anxiety, and non-compliance with medical treatment. However, there was no evidence of current episodes of self harming behavior, risk of harm to self or others, threatening or aggressive behavior, or imminent risk of deterioration if the patient had been transitioned back to intensive outpatient treatment, such as the partial hospitalization program (PHP) level of care that had been previously used. Given the patient's treatment in the residential setting, it would have been appropriate for her to be treated in the PHP setting as a way of trying to transition back to the community setting. It is noted that providers in the previous residential setting had recommended continued residential treatment. However, there is lack of documentation of a level of symptom severity that required the use of ongoing RTC level of care. The patient was in need of chronic psychiatric treatment, but there is no indication that this treatment needed to occur in the residential setting.

*Id.* Dr. Holmes noted that PHP had been attempted previously, but stated that "[t]he patient was in a better position to receive benefit from PHP level of care given her 6 week stay in a separate

8

United States District Court
Northern District of California

1  residential setting." *Id.*

2  On November 5, 2018, the Plan sent Eric's counsel a letter stating that, after MRI had reviewed the information they sent, it had affirmed its prior decision. *Id.* at 2652. The Plan stated that it would present the claims at the next Benefits Committee Meeting, and that "[t]he Trustees will consider all of the evidence and written testimony submitted in support of the appeal." *Id.* On December 14, the Plan notified Eric's counsel that the next Benefits Committee Meeting would be on February 19, 2019. *Id.* at 2658.

Dr. Steven M. Simons, who is board certified by the American Board of Internal Medicine with a Pulmonary Disease Subspecialty and Critical Care Subspecialty and the Chief Medical Advisor of the Benefits Committee, assisted during the February 19 meeting with their review. PLAN002677-78; Dkt. No. 53-7. Dr. Simons provided the committee with detailed notes regarding RP's medical history and treatment. PLAN002678-79; 2666-2676. Plan staff[2] recommended "denial of the appeal pursuant to the Plan rules and the determinations by MRI that treatment is not medically necessary pursuant to Health Plan rules." *Id.* at 2679. The Plan informed Eric of this decision on February 22, 2019, stating that Dr. Simons had found that "continued residential treatment for your daughter was not medically necessary under the Plan, as there was a lack of documentation of diabetic ketoacidosis that would indicate that she was not capable of managing her own diabetes." *Id.* at 2680. The letter noted that RP had already reached the maximum benefit from her treatment at ViewPoint and that "[t]reatment refusal by the patient in the absence of documented efforts to enforce medication compliance is not sufficient rationale for continuation of residential treatment in a different residential facility." *Id.* "As a result, the reviewers determined the patient's ongoing mental health needs could be managed in a less restrictive setting, such as an intensive outpatient program, considering she was not suicidal or homicidal and was not self-harming or physically aggressive." *Id.* The letter further quoted the definition of medically necessary under the Plan. *Id.* at 2681.

---

[2] In his Reply, Eric contends that reference to "Plan Staff" is vague and constitutes an abuse of discretion. Dkt. No. 60 at 11. He points to no case law to support this contention, and I find it unpersuasive.

1    Eric filed this lawsuit on January 22, 2019. Dkt. No. 1. The minutes of the February 19
2    meeting reflected that members had to make their decisions based on the facts presented and the
3    recommendations of staff, without any consideration of the pending litigation. PLAN002678.
4    The parties filed cross-motions for summary judgment on January 29, 2020. Dkt. Nos. 53, 54.

## LEGAL STANDARD

As I held in my prior order, I review this ERISA benefits denial case for abuse of discretion. Dkt. No. 47. In this context, a motion for summary judgment "is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Harlick v. Blue Shield of California*, 686 F.3d 699, 706 (9th Cir. 2012) (citation omitted). "Any interpretation or determination made pursuant to [the Plan's] discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." *Nolan v. Heald Coll.*, 551 F. 3d 1148, 1150–51 (9th Cir. 2009).

Under the abuse of discretion standard, the Plan's determination "will not be disturbed if reasonable." *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (citation omitted). "This reasonableness standard requires deference to the administrator's benefits decision unless it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (citation omitted).

## DISCUSSION

### I. MOTION TO SEAL

The Plan filed an unopposed motion to seal portions of the record that consist primarily of RP's medical records while she was a minor. Dkt. No. 52. I GRANT the Plan's motion, as RP's privacy interest outweighs any public interest in the disclosure of such material. The Plan and Eric did not seek to file any portions of their briefing, though RP's medical history was discussed at times. Accordingly, I will not seal any portion of this order, which references the same information included in the briefing.

### II. MOTION FOR LEAVE TO FILE A SUR-REPLY

Eric's reply contained new arguments regarding the Plan's relationship with MRI that were

10

not raised in his opening motion (or in his opposition to the Plan's motion), and that are not properly considered rebuttal argument. Dkt. No. 60. The Plan filed a motion for leave to file a sur-reply. Dkt. No. 61. I will not consider Eric's arguments in his Reply that are not proper rebuttal argument. Accordingly, the Plan's motion is DENIED AS MOOT.[3]

### III. EARLY APPEALS AND ALLEGED PROCEDURAL VIOLATIONS

Eric argues that the Plan made multiple procedural errors that prevented a full and fair review of his claim at each stage of its appeal process, thus impacting the abuse of discretion review of the Plan's denial of his claim. However, his arguments that the Plan violated ERISA regulations are contradicted by the undisputed facts in the record. It is not obvious that the Plan committed any clear violations of ERISA, let alone enough procedural violations to affect the standard of review. I examine each of the alleged ERISA violations in turn.

Eric asserts that the Plan repeatedly failed to explain the guidelines that were used to deny his claim and used "rotating" level of care guidelines with each successive review. Dkt. No. 54 at 19, 21-22. This is contradicted by the written claims denials. The first two reviews by Anthem explicitly referenced the provision of the Anthem guidelines that they used and stated that they were available upon request.[4] With respect to the later denials of Eric's claim, each of the MRI reviews discussed the Plan guidelines, also stating that the guidelines were available upon request and at times quoting them. In addition, "Plan Language" was listed in the records reviewed by MRI. Most of the MRI reviewers also separately addressed the claim under the Anthem

---

[3] Even if I were to consider Eric's new argument regarding the "cozy" relationship between MRI and the Plan, I find it unpersuasive. Dkt. No. 60 at 1. For the reasons discussed in this Order, it is not inherently improper that reviewers had access to prior decisions; arguments in Eric's reply do not change this conclusion. He has not cited any cases that payments to a third-party reviewer such as MRI in the alleged amounts create a financial interest that would warrant a degree of skepticism. But if I applied a degree of skepticism to the decisions of MRI, I would still find that the final Plan decision is not arbitrary and capricious. With respect to Eric's second new argument, he failed to identify evidence that Dr. Simons failed to consider RP's A1c levels; in fact, Dr. Simons's notes explicitly refer to A1c levels several times. *See* Dkt. No. 60 at 4; PLAN002666, 2667, 2671.

[4] Eric has not argued or explained how the first two reviews' use of the Anthem guidelines amounted to an ERISA violation. Note that the initial Anthem denial stated that reviewers considered "the health plans Medical Policies, Clinical Guidelines, and/or other available information" and that medical policies are available on Anthem's website. PLAN000019.

11

guidelines, but the explanation of denial under the Plan guidelines is significantly more detailed. It is not clear whether Eric received the underlying MRI denials or only the letters subsequently sent to him by the Plan.[5] However, the letters to him also explained that his appeals were denied under the Plan guidelines and quoted the applicable portion of those guidelines. *See* PLAN000107, 358.

At most, Eric has identified two potential minor violations of ERISA. There is some dispute regarding whether he received the first two written denials from Anthem; he does not dispute receiving the remaining claim denials. ERISA requires that the Plan provide him "with written or electronic notification of *any* adverse benefit determination." 29 C.F.R. § 2560.503-1 (emphasis added). While the Plan asserts that written denials were both sent to his address, he denies receiving them at least initially, which is supported by the record. Dkt. No. 54 at 10-12; Dkt. No. 57 at 3. And at oral argument his counsel also asserted that the claim denials did not provide the name of the physician who had reviewed the claim. This is not wholly supported by the record. Every written denial contains the name of the reviewing physician, although the letters to Eric do not.

I assume that Eric never received any written or electronic notifications of the first two adverse benefit determinations and that he did not receive the names of the reviewing physicians from MRI. But to demonstrate an ERISA procedural violation that affects my determination of no abuse of discretion, he must show that he suffered substantive harm. *Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 984 (9th Cir. 2005). He acknowledges that he received voicemails informing him of the Anthem decisions and was able to appeal each decision. Dkt. No. 54 at 10. He also acknowledges that RP's residential treatment provider, Uinta, received written notice of the second Anthem denial. *Id.* at 11-12. As discussed below, the denials of Eric's claim by Anthem and MRI were consistent and based upon the same considerations, and he was able to appeal and provide further evidence throughout the process. Perhaps most importantly, at some point before the final decision it appears that Eric's counsel received all of the underlying written

---

[5] It appears that the MRI reviews were enclosed with the letters to Eric. *See*, e.g., PLAN002652-53.

12

denials. He provided thousands of pages of written evidence to the benefits committee, which considered his evidence and arguments. *See* PLAN000398 (counsel's letter to the Plan citing the MRI reviews). There is no evidence that Eric suffered any harm, let alone substantive harm, from these relatively minor procedural violations in the early stages of his appeal.

Eric also asserts that the Plan repeatedly changed the basis for its denial. Dkt. No. 54 at 22. Again, I disagree. His characterizations of each claim denial, and especially of the final denial, are misleading. He says that the reasons for the final denial were a lack of documentation of ketoacidosis and a finding that treatment refusal by the patient in the absence of documented efforts to enforce medication compliance is insufficient to justify residential treatment. Dkt. No. 58 at 13. But, as discussed further below, the final decision was much more detailed. It examined several aspects of RP's purported need for residential care before concluding that lesser intensive treatment was appropriate and medically necessary. Further, while the earlier claims denials are all not identical, they each focus on RP's need for 24-hour care in a residential facility, harm that she could face absent such care, and whether lesser intensive treatment could be provided after her discharge from ViewPoint. Even though the final decision does mention the term "ketoacidosis" for the first time, this was undisputedly the greatest risk facing RP due to her inability to manage her diabetes and was a central inquiry in each of the reviews.

The cases that Eric cites are distinguishable. In *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, the plan administrator's final decision mentioned, for the first time, the need for a particular evaluation and denied the claim on the basis that there was none. 522 F.3d 863, 872 (9th Cir. 2008). In *Salomaa v. Honda Long Term Disability Plan*, the bases for denial ranged widely from absence of HIV or cancer to explain weight loss, to lack of depression, to lack of abnormalities in cognitive function. 642 F.3d 666, 676-79 (9th Cir. 2011). And in *Harlick v. Blue Shield of California*, the plan administrator failed to argue that the treatment at issue was medically necessary in the first instance, and the court held that it could not re-open the administrative process to make that argument for the first time in federal court. 686 F.3d 699, 719-21 (9th Cir. 2012). Here, by contrast, all of the claims denials, including the Plan's final denial, discussed the central issue of potential diabetes complications resulting from RP's various

13

mental health conditions. Eric was able to identify the bases for the denials and fully respond to them throughout the appeal.

Eric relies heavily on *Wit v. United Behavioral Health*, No. 14-cv-02346-JCS, 2019 WL 1033730 (N.D. Cal. Mar. 5, 2019), arguing that the Plan's denial of his claim conflicted with the ordinary level of care in evaluating mental health claims. Dkt. No. 54 at 17-18. In *Wit*, the plaintiffs alleged that the plan coverage guidelines did not comply with the terms of their insurance plans and/or state law. 2019 WL 1033730, at *1. Plaintiffs asserted only facial challenges to the guidelines, and not challenges to individual benefit determinations. *Id.* The court issued detailed findings of fact and conclusions of law regarding what the generally accepted standard of care is in the medical community, and found that the challenged guidelines overemphasized acute symptoms. *Id.* at *17-42. It did not apply these guidelines to a specific factual scenario. By contrast, Eric does not challenge the Plan's guidelines or definition of "medically necessary," which includes the generally accepted standard of care, but alleges that the Plan did not properly apply the standards to its claim. Accordingly, *Wit* is inapposite.

Next, Eric argues that the Plan committed procedural error because MRI improperly informed its reviewers of the prior decision, thus unduly influencing its decision. Dkt. No. 58 at 6-7. While it is true that the review must not "afford deference to the initial adverse benefit determination," 29 C.F.R. § 2560.503-1(h)(2)(iv)(3)(ii), Eric has not identified any cases that have held that mere access to the prior adverse benefit determination amounts to a procedural violation. *See Grossman v. Directors Guild of Am., Inc.*, No. 516CV01840GWSPX, 2019 WL 4316259, at *2 (C.D. Cal. June 13, 2019) ("Providing the entire record on the claim to an external reviewer is not an ERISA violation"). He has also not pointed to any other compelling evidence that any of the determinations were unduly influenced by prior denials, such as heavy reliance on prior denials or failure to consider new evidence. Indeed, he recognizes that each denial provides a slightly different analysis of RP's treatment. Dkt. No. 54 at 23.

Eric points to Dr. Hartman's opinion that RP could be given antipsychotic medications against her will by her parents or pursuant to a court order as "the best example of Defendant's abuse of discretion." Dkt. No. 58 at 4. Dr. Hartman did not recommend this course of action but

14

noted that absent such a measure, significant improvement was unlikely to take place. Instead, Dr. Hartman's conclusion that residential care was not medically necessary was based on a "lack of documentation of a level of symptom severity that required the use of ongoing RTC level of care." PLAN002649. More importantly, the final Plan decision did not base its decision on whether medication could be provided to RP against her will. Eric has not provided any evidence that suggests that Dr. Hartman's statement that RP was unlikely to significantly improve absent forced administration of antipsychotic medication amounted to a procedural violation. Indeed, Eric did not argue this in his motion for summary judgment and did not provide any case law to support his position in opposing the Plan's motion. Dkt. No. 58 at 4-5. I am not persuaded by his argument.

Finally, Eric contends that the Plan violated its duty to engage in a full and fair dialogue with him because it failed to adequately consider all of the evidence at each stage of the process, adequately reach out to RP's physicians, and show him what was needed in order to perfect his claim. Dkt. No. 58 at 3-4, 5-6, 8-9. However, the Plan did not fail to inform Eric of the basis of its decisions. The record indicates that at each stage of the appeal, the Plan explained why the claim was denied based on the information available at the time, and it ultimately reviewed thousands of pages of evidence submitted by Eric. The record does not demonstrate that there was insufficient dialogue with him in violation of ERISA procedure.

With respect to Eric's contention that the Plan failed to contact RP's treating physicians and discounted their written opinions without explanation, I am not persuaded that the Plan committed a procedural error. Importantly, the record does not support Eric's position that the opinions of RP's treating physicians were ignored. The evidence reflects that at each stage of appeal the reviewers considered all evidence available, including the written recommendations of RP's physicians. The second Anthem review, the September 18, 2018 MRI review, and the final review of the Benefits Committee explicitly recognized the recommendations of RP's treating physicians and explained how the reviewers came to a different decision. For this reason alone, this case differs from my opinion in *James v. AT & T W. Disability Benefits Program*, 41 F. Supp. 3d 849, 877 (N.D. Cal. 2014), which Eric raised at oral argument.

In addition, Eric does not dispute that at times, reviewers attempted to contact RP's

physicians. At oral argument, the parties disagreed whether a legitimate conversation occurred between reviewers and Uinta. Assuming Eric is correct that this phone call was a denial and not a discussion about RP's condition, it is still not evidence that the Plan abused its discretion. At oral argument, Eric's counsel acknowledged that the "treating physician rule" does not apply. Eric has not provided any authority that calls for a finding of abuse of discretion simply because a plan administrator was not able to speak to any of the treating physicians.

Accordingly, I do not find that any of the alleged procedural violations affect my conclusion that the Plan did not abuse its discretion.[6]

## IV. FEBRUARY 22, 2019 DENIAL

I review the Plan's final denial of Eric's claim for abuse of discretion. He makes several challenges to the Benefits Committee's final denial of his claim on February 22, 2019. First, he argues that the Plan abused its discretion because its decision contradicted the recommendations of all of RP's treatment providers. Dkt. No. 54 at 24. Second, he asserts that Dr. Simons's conclusions that RP was psychotic, anxious, and displayed impaired judgment, as well as that she could forcibly be administered medication, is sufficient to find an abuse of discretion. *Id.* at 18. He also contends that the Plan's decision contradicts the evidence in the record that RP was not able to manage her diabetes on her own. *Id.* at 20, 23. Third, he challenges the Plan's determination, and the Plan guidelines themselves, because he contends that they over-emphasized acute symptoms (e.g., diabetic ketoacidosis) while ignoring treatments that are medically necessary long-term. Dkt. No. 58 at 14-16. Similarly, he argues that the Plan failed to account for the comorbidity of RP's diabetes and mental health conditions. Dkt. No. 54 at 23.

Fourth, Eric contends that the Plan failed to properly credit the reliable opinions of RP's treating physicians, that Dr. Simons "went well beyond his [medical] specialty," and that "[t]he proper expert on this subject should have been an endocrinologist." Dkt. No. 54 at 24, Dkt. No. 58 at 6, 10-11. Fifth, he disagrees with Dr. Simons's conclusion that there was no evidence of

---

[6] He also contends that the Plan was "operating under a conflict of interest sufficient to invoke some level of heightened scrutiny," but at no point explains the conflict of interest or the appropriate level of heightened scrutiny. Dkt. No. 54 at 16 n.2.

16

ketoacidosis. Dkt. No. at 10. Finally, he asserts that the Plan applied an unreasonable interpretation of the relevant plan terms, citing an "arms-length approach to decision making and apparent unfamiliarity with the ever-changing level of care guidelines." Dkt. No. 54 at 18-19.

Eric's arguments are largely contradicted by a careful review of the Plan's minutes and decision. Neither the minutes from the February 19 meeting nor February 22 letter make any mention of forced administration of medication. Instead, they state that "[t]reatment refusal by the patient in the absence of documented efforts to enforce medication compliance is not [a] sufficient rationale for continuation of residential treatment in a different residential facility." PLAN002680. Both the minutes and the letter conclude that by the end of RP's stay at ViewPoint, she had reached "the maximum benefit" from treatment in a residential program, that her mental health needs could be managed in a less restrictive setting, and that there was a lack of documentation of symptom severity—including ketoacidosis— that would require 24-hour a day care. With respect to RP's management of her diabetes, the question facing the Plan was not whether RP could treat her diabetes on her own, but whether continued residential treatment was medically necessary to manage RP's diabetes. The Plan concluded that lesser intensive treatment, such as partial hospitalization or intensive outpatient treatment, could treat RP effectively.

Further, the minutes and February 22 letter reference RP's mental health needs as well as her diabetes, and clearly contemplated the correlation between the two. Indeed, the comorbidity of RP's diabetes and mental health conditions form the core of her claim for treatment, both at ViewPoint and at Uinta. Dr. Simons provided detailed notes at the meeting describing RP's treatment, and cited the extensive documentation Eric's counsel had submitted, including treatment records and physician recommendations. PLAN002666-76. Moreover, the notes included the observation that the ViewPoint "team unanimously recommended long term residential center," *id.* at 2676, and the meeting minutes reflect that the committee considered that "providers in the residential setting had suggested continued residential treatment." *Id.* at 2679. The Benefits Committee concluded that RP "was in need of chronic psychiatric treatment, but there is no indication that this treatment needed to occur in the residential setting." *Id.*

I do not find that the February 22, 2019 denial was arbitrary and capricious, or an

17

unreasonable interpretation of the Plan rules. RP's most pressing medical issue was her inability to manage her diabetes and the resulting risk that she could develop diabetic ketoacidosis. The committee considered RP's acute health concerns upon her discharge from ViewPoint, including not only the risk of ketoacidosis, but also whether RP was self-harming or violent and whether there were any other indications that RP needed 24-hour monitoring. It also considered RP's extensive mental health conditions and treatment. RP's stay at ViewPoint was her first stay at a long-term residential facility, and the Plan could rationally conclude that she could be able to "transition back to the community setting" without need for further residential treatment. *Id.* at 2679. It was also rational to conclude, in light of RP's particular medical history, that she had obtained the maximum benefit from a residential treatment facility after her time at ViewPoint and that an intensive outpatient setting was the most "appropriate and cost-effective treatment . . . that can be safely provided, at the most cost-efficient and medically appropriate site and level of service" as defined by the Plan's terms. *Id.* at 681.

As discussed in detail above, I disagree with Eric's position that the final decision applied a "merry-go-round" of guidelines. At any rate, the Benefits Committee clearly concluded that RP's treatment at Uinta was "not medically necessary pursuant to Health Plan rules." PLAN002679; *see also id.* at 2681 (quoting the definition of medically necessary in the March 2015 Health Plan Booklet). I also disagree with Eric's assertion that the Plan abused its discretion because Dr. Simons was not an endocrinologist. He does not provide any authority for this position. Moreover, the earlier reviews were conducted by different physicians specializing in adolescent psychiatry, which is the appropriate field to address RP's complicated psychological conditions. On its own, RP's diabetes was a relatively straightforward issue to address. Moreover, Dr. Simons is Board Certified in internal medicine and has extensive experience. I do not find that the Benefits Committee's use of Dr. Simons was an abuse of discretion.

Perhaps Eric's strongest argument is the Plan's disagreement with the opinions of RP's treating physicians. It is important to consider the dates and content of each recommendation. The ViewPoint doctors all recommended continued residential treatment. But the other doctors' letters opining on RP's condition were largely addressed to the time before RP was treated at

ViewPoint. Although some submitted letters during the pendency of Eric's appeal recommending residential treatment, these doctors had not treated RP since before her stay at ViewPoint or at all. Eric's contention that the Plan's decision contradicts the opinion of every one of RP's physicians should be understood in that context. That the Plan disagreed with the recommendations of the ViewPoint doctors that RP be treated at Uinta, while persuasive evidence upon a de novo review, cannot alone support an abuse of discretion.

The cases that Eric cites are distinguishable. In *Wit* (which, as discussed above, is inapposite) and *S.B. v. Oxford Health Ins., Inc.*, No. 3:17-CV-1485 (MPS), 2019 WL 5726901 (D. Conn. Nov. 5, 2019), the courts took issue with the plans' failure to adequately consider whether the treatment was medically necessary to treat the patients' underlying conditions, such as eating disorders, and only focused on near-term issues such as critical weight loss. Here, the Benefits Committee clearly considered RP's underlying medical conditions that complicated her diabetes, but expressed skepticism that further residential treatment was necessary or would even provide additional benefits. In *Lukas v. United Behavioral Health*, the court found an abuse of discretion where the plan concluded that there was no evidence that the claimant needed the requested treatment, but failed to mention or consider evidence from the claimant's doctor explaining why treatment was needed. 504 F. App'x 628, 629-30 (9th Cir. 2013). Here, by contrast, the Benefits Committee considered the recommendations of RP's physicians and explained why it did not think Eric's claim met the Plan definition of medically necessary. Finally, in *Kerry W. v. Anthem Blue Cross & Blue Shield*, the court found that the denials of coverage "contained no factual findings to support their conclusions about [claimant's] mental health." No. 2:19-CV-67, 2020 WL 1083631, at *5 (D. Utah Mar. 6, 2020).

It is possible that, had RP been transitioned to an intensive outpatient or partial hospitalization program, she would have ultimately needed to be re-placed into another residential treatment program. However, it is also possible that such treatment may have been equally or even more effective after treatment at ViewPoint, even if it had not been prior to her stay at ViewPoint. At any rate, the Plan's conclusion that a lower level of care was the most cost-efficient and medically appropriate level of service was not arbitrary or capricious. When

examining the record in detail, it is clear that the Plan's decision was based upon a thorough review of RP's treatment history by appropriately credentialed medical professionals, and it was not unreasonable to conclude that, after an eight-week period of residential treatment, lesser intensive treatment was medically necessary given RP's history, diabetes, and psychological condition. For these reasons, the Plan did not abuse its discretion.

## CONCLUSION

For the above reasons, I GRANT the Plan's motion for summary judgment and DENY Eric's motion for summary judgment. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: March 30, 2020

William H. Orrick
United States District Judge